J-A24036-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FRICK LENDER ASSOCIATES, L.P., A PENNSYLVANIA LIMITED PARTNERSHIP | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : | |
| v. | : : | |
| DUQUESNE LIGHT COMPANY | : | No. 369 WDA 2020 |

Appeal from the Judgment Entered February 20, 2020
in the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD17-009014

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED FEBRUARY 10, 2021**

Frick Lender Associates, L.P. ("Frick"), appeals from the Order granting Duquesne Light Company's ("Duquesne") Motion for Summary Judgment.[1] We affirm.

The trial court summarized the factual and procedural history of this appeal as follows:

[Frick] and [Duquesne] have been in a dispute over the maintenance of certain underground electrical vaults since 2016. [Frick] is the owner of the Frick Building, located in downtown Pittsburgh (the "City")[,] and [Duquesne] provides electrical

---

[1] We note that the Order granting Duquesne's Motion for Summary Judgment disposes of all of the claims between all of the parties. **See McCutcheon v. Philadelphia Electric Co.**, 788 A.2d 345 (Pa. Super. 2002) (stating that "[a]n appeal will lie only from a final order unless otherwise permitted by statute or rule."); Pa.R.A.P. 341(b)(1) (stating that "[a] final order is any order that disposes of all claims and of all parties."). Accordingly, the Order is final and appealable.

service to the building. [The electrical vaults house the equipment that Duquesne uses to power the Frick Building. Duquesne supplies, operates, and maintains the electrical equipment.] The subject vaults are located under the sidewalk on the side of the Frick Building that is bounded by Grant Street [(the "Frick Building-Grant Street Sidewalk")].

[Frick's] predecessor built the vaults in or around 1958. Certain work has been performed on the vaults over the years by [Frick] and its predecessor. In 1984, the vault roof was reinforced. The roof was altered again in 1987 due to the installation of a handicap ramp.

On or about January 25, 2011, a portion of the covers of the vaults collapsed. [Frick] made the necessary repairs to the vaults. The underlying dispute arose over additional repairs that were needed. In March [] 2016, [Duquesne] informed [Frick] that it had concerns about the structural integrity of the vaults. As a result, [Frick] hired Brace Engineering to perform an inspection. [Duquesne's] representatives then met with [Frick's] engineer. After examining the vaults, the engineer recommended that the vaults either be repaired or replaced due to poor and aging condition. [Duquesne] received structural plans from Brace Engineering on January 17, 2017. Both parties claimed the other is responsible for the repair costs. The parties could not reach a resolution as to who own[s] the vaults and is responsible for the costs.

On June 21, 2017, [Frick] filed its Complaint for Declaratory Judgment and Injunctive Relief[,] asking the [trial c]ourt to determine whether [Duquesne] is responsible for the repair costs. [Duquesne] timely filed its Answer and New Matter, asserting a failure to state a claim, course of dealings, waiver, estoppel, adequate remedy at law[,] and the doctrine of unclean hands[,] given [Frick's] alleged long-standing failure to make the necessary repairs.

On February 13, 2019, the parties entered into an agreement to complete the repairs and share equally in the cost. They further agreed that the party found responsible by the [c]ourt would refund the opposing party its portion of the costs paid upon entry of a final order. The parties also agreed to postpone the trial[,] since there were no disputed issues of material fact and only a single legal issue to be ruled upon by

the court. Accordingly, both parties moved for summary judgment.

After consideration of the parties' briefs and oral argument, the [trial c]ourt granted [Duquesne's] Motion for Summary Judgment and denied [Frick's] Cross[-]Motion for Summary Judgment.

Trial Court Opinion, 4/24/20, at 1-3 (heading and some paragraph breaks omitted). Frick filed a timely Notice of Appeal and a Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

On appeal, Frick raises the following questions for our review:

I. Did the trial court err in granting summary judgment for [Duquesne,] as the undisputed facts demonstrate that [Frick] has no legal ownership of the electrical vaults?

II. Did the trial court err in granting summary judgment for [Duquesne] by determining that the 1856 case of [***Paul v. Carver***, 26 Pa. 223 (Pa. 1856),] is applicable to this matter?

III. Did the trial court err in determining that [Frick] would be responsible for the maintenance of the electrical vaults even if [Frick] owns to the center of Grant Street?

IV. Did the trial court err in finding that the lack of a "service agreement[,"] and work allegedly performed by [Frick's] predecessor in title were determinative of [Frick's] ownership of the electrical vaults?

Brief for Appellant at 3.

Our standard and scope of review is well settled:

[S]ummary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against

the moving party. An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. Because the claim regarding whether there are genuine issues of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary.

***Nicolaou v. Martin***, 195 A.3d 880, 891-92 (Pa. 2018) (citations omitted).

We will consider Frick's first two claims together, as they are related. In its first claim, Frick argues that the electrical vaults are located outside of the boundaries of its property and that Duquesne owns the property on which the electrical vaults are located. ***See*** Brief for Appellant at 12-16. Frick states that the deed to Frick's property, Frick's title policy, and a survey that Frick had obtained all indicate that its property ends at the edge of the Frick Building-Grant Street Sidewalk, and that the vaults are located under the Frick Building-Grant Street Sidewalk. ***Id.***[2]

In its second claim, Frick argues that the trial court erred in applying our Supreme Court's decision in ***Paul*** to the instant case. Brief for Appellant at 17-21. Frick claims that the holding in ***Paul*** does not apply to the instant case because (1) ***Paul*** only applies where a street has been vacated, and Grant Street has not been vacated, ***id.*** at 17-18; (2) Frick's deed contains a more detailed description of the property boundaries than the deed in ***Paul***,

---

[2] Frick also claims that Duquesne currently possesses the "right to occupy" the property on which the vaults are located, by way of a City of Pittsburgh Ordinance. Brief for Appellant at 15-16. We will address this claim with Frick's third claim, which makes the same argument.

- 4 -

*id.* at 18-20; (3) the *Paul* Court differentiates its facts from a case where the subject property is laid out in lots, and Frick's property is laid out in lots. *Id.* at 20. Frick also claims that the trial court erred in finding that *Paul* created a legal presumption that a deed description specifying roads as the property boundaries transfers ownership of the property to the middle of the specified streets, and the party that opposes this presumption has the burden to produce evidence to overcome said presumption. *Id.* at 21.

We begin with an analysis of our Supreme Court's landmark Opinion in *Paul*, regarding an ejectment dispute between Alexander B. Carver ("Carver") and James W. Paul ("Paul"). *See Paul*, 26 Pa. at 223. In 1827, Tidmarsh Street was created in Moyamensing Township, Philadelphia County. *Id.* Tidmarsh Street was generally oriented in an east to west direction, and was approximately 50 feet wide. *Id.* Between 1827 and 1850, the property on the northern side of Tidmarsh Street, between 12th and 13th Streets, was sold several times. *Id.* Relevantly, in 1836, "Mrs. Brinton,"[3] the wife of John H. Brinton, conveyed the property (hereinafter the "Brinton Property") to William Perry. *Id.* The deed (the "Brinton-Perry Deed") described the Brinton Property as "extending along the east side of Thirteenth [S]treet one hundred and fifty-four feet more or less to Tidmarsh [S]treet, thence south-easterly, *along the northerly side of the said*

---

[3] The *Paul* opinion does not provide Mrs. Brinton's first name.

*Tidmarsh* [S]*treet*, four hundred and one feet more or less to Twelfth [S]treet." *Id.* (emphasis in original; some quotation marks omitted). Perry purchased the Brinton Property with a mortgage that was held by Mrs. Brinton. *Id.*

In 1847, the commissioners of Moyamensing obtained a court judgment against Perry, and acquired the Brinton Property in satisfaction of the judgment. *Id.* at 223-24. Instead of describing the Brinton Property as running "along the northerly side" of Tidmarsh Street, as described in the Brinton-Perry Deed, this deed described the Brinton Property as "beginning at the south-west corner of Christian and Twelfth [S]treets, and extending southward, along the west side of Twelfth [S]treet, 248 feet 3½ inches, *to the centre of old Tidmarsh* [S]*treet* (vacated or about to be vacated), thence extending westward, along the centre of old Tidmarsh [S]treet aforesaid, 402 feet to Thirteenth [S]treet.'" *Id.* at 224 (emphasis in original). Moyamensing Township conveyed the Brinton Property to Sam R. Blair, who later conveyed it to "Rockhill." *Id.* After Tidmarsh Street was vacated in 1850, Rockhill entered upon the Brinton Property, including the 25 foot by 402 foot strip that had previously made up the northern half of Tidmarsh Street, between 12th and 13th Streets (the "disputed parcel"). *Id.* At some point thereafter, Rockhill sold the disputed parcel to Paul. *Id.*

In 1853, Mrs. Brinton executed a *levari facias*[4] on the Brinton Property, and sold it to Carver. *Id.* at 223. Carver filed an ejectment action against Paul, alleging that he obtained title to the disputed parcel by way of his 1853 purchase of the Brinton Property. *Id.* at 224. A jury found in favor of Carver, and Paul appealed to our Supreme Court. *Id.*

Our Supreme Court's analysis in *Paul* was limited to whether Carver's deed to the Brinton Property, the Brinton-Perry Deed, included the disputed parcel.[5] *See id.* at 224-27. The issue was whether the language that described the property boundary as "along the northerly side of the said Tidmarsh [S]treet" also included the disputed parcel, which spanned from the edge of the northerly side of Tidmarsh Street to the center of Tidmarsh Street. *Id.* Our Supreme Court found in favor of Carver, holding that the Brinton-Perry Deed included the disputed parcel. *Id.* at 223. The Court stated that

> [w]here a public street or highway is called for as a boundary or monument in a deed, it is used as an entirety to the centre of it, and to that extent the fee passes. In such cases, it will require an express exception in the deed, or some clear and unequivocal declaration, or certain and immemorial usage, to limit the title of the grantee to the edge of the street. And although the measurement of the distance set forth in the conveyance, brings

---

[4] *Levari facias* is defined as "[a] writ of execution ordering a sheriff to seize a judgment debtor's goods and income from lands until the judgment debt is satisfied." *Levari Facias*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[5] The Court does not address the remainder of the Brinton Property, *i.e.*, the portion of the property that was located to the north of the disputed parcel.

the line only to the side of the street, this is not sufficient to control the rule of law which carries the title to the centre of it.

*Paul*, 26 Pa. at 223 (paragraph breaks omitted). Notably, the *Paul* Court held that the description used in the Brinton-Perry Deed, which included courses and distances, and references to the surrounding streets, was not a clear and unequivocal declaration that the property ended at the edge of Tidmarsh Street. *Id.*; *accord Cox v. Freedley*, 33 Pa. 124, 127 (1859); *Spackman v. Steidel*, 88 Pa. 453, 458 (1879); *Transue v. Sell*, 105 Pa. 604, 609 (1884); *Neely v. City of Phila.*, 61 A. 1096, 1098 (Pa. 1905); *Willock v. Beaver Valley R. Co.*, 72 A. 237, 238 (Pa. 1909); *Saccone v. W. End Tr. Co.*, 73 A. 971, 972 (Pa. 1909); *Oliver v. Ormsby*, 73 A. 973, 975 (Pa. 1909); *Rahn v. Hess*, 106 A.2d 461, 464 (Pa. 1954). Moreover, *Paul* and its progeny do not state that a property owner only takes ownership of the property underlying a street *after* the street is vacated. *Id.*

Here, Frick's deed describes its property boundaries, in relevant part, as follows:

> Beginning at the point formed by the intersection of the southwesterly line of Fifth Avenue (60.07 feet wide) and the Northwesterly line of Grant Street (80.109 feet wide); thence *along the Northwesterly line of Grant Street*, South 30° 56' 40" West, a distance of 226.12 feet to a point….

Deed, 3/24/05 (emphasis added).

Similar to *Paul*, Frick's deed calls for its property to extend "along" a street—specifically, Grant Street—and describes the courses and distances of

the boundary lines with reference to the surrounding streets. *See Paul*, 26 Pa. at 223; Deed 3/24/05. We conclude that the evidence, viewed in a light most favorable to Frick as the non-moving party, establishes that Frick's property line extends to the center of Grant Street, and therefore, Frick owns the property on which the electrical vaults are located. *See Paul*, *supra*. Accordingly, Frick's first two claims fail.

In its third claim, Frick argues that even if its property line extends to the center of Grant Street, Duquesne is still responsible for repair of the electrical vaults. *See* Brief for Appellant at 22-24. Frick claims that the electrical vaults fall within the boundaries of an 80 foot right-of-way, which includes Grant Street and the Frick Building-Grant Street Sidewalk (the "Grant Street right-of-way"). *Id.* at 15-17; 22-24. Frick states that a City of Pittsburgh Ordinance, created in 1904 by S.C. Bill Number 126, provides Duquesne with the legal right to occupy the Grant Street right-of-way. *Id.*

"Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit." *Bailey v. Zoning Bd. of Adjustment of City of Phila.*, 801 A.2d 492, 502 (Pa. 2002) (citations omitted).

Here, Pittsburgh City Ordinance S.C. Bill No. 126 describes Duquesne's property rights as

> ***the right to enter*** upon the streets, alleys and highways of the City of Pittsburgh, for the purpose of erecting, constructing, laying, maintaining, operating, and using its wires, cables, and conductors upon, through, along, under and over said streets, alleys, and highways.

PITTSBURGH, PA., S.C. BILL NO. 126 (1904), https://archive.org/details/Pgh municipalrecord1904/page/n201/mode/2up (emphasis added).

The plain language of the Ordinance grants Duquesne the right to enter the property for specific purposes. ***See id.*** The Ordinance does not provide Duquesne with ownership of the property, or the responsibility to maintain the property. ***Id.*** The only maintenance responsibility the Ordinance imposes upon Duquesne is the duty to maintain "its wires, cables, and conductors" that are located within the right-of-way. ***Id.*** Frick has not alleged that the electrical vaults are "wires," "cables," or "conductors." We conclude that Pittsburgh City Ordinance S.C. Bill No. 126 does not grant Duquesne ownership of, nor the responsibility to maintain, the electrical vaults. ***See Bailey***, ***supra***. Accordingly, Frick's third claim fails.

In its fourth claim, Frick argues that Duquesne has not produced any evidence to prove that Frick is responsible for maintenance of the electrical vaults. ***See*** Brief for Appellant at 24-26.

Here, as we have determined that Frick owns the property on which the vaults are located, Duquesne would only be responsible for maintaining the vaults if it has assumed or been assigned ownership of, or responsibility to maintain, the vaults. The only evidence submitted by Frick, on these

grounds, is the City of Pittsburgh Ordinance. Because we have determined that the City of Pittsburgh Ordinance does not assign ownership of, or the responsibility to maintain, the electrical vaults, this claim fails.

Accordingly, because the evidence, viewed in a light most favorable to Frick as the non-moving party, establishes that Frick owns the property on which the vaults are located, and that Duquesne was not assigned ownership of or responsibility to maintain the vaults, we conclude that the trial court did not abuse its discretion in granting Duquesne's Motion for Summary Judgment. *See Nicolaou*, *supra*.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/10/2021